UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


AMANDA L. CALLOWAY,         )
         )
         Plaintiff,         )
         )
         v.         )         No. 4:06CV1293 TIA
         )
MICHAEL J. ASTRUE,[1] Commissioner         )
of Social Security,         )
         )
         Defendant.         )


## MEMORANDUM AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration. The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.    Procedural History

On April 8, 2004, Claimant Amanda L. Calloway's mother filed an application for Child's

Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42

U.S.C. §§ 1381, et seq. (Tr. 11).[2] In the Disability Report Claimant's mother states that her

daughter's disability began on April 1, 2004, due to bipolar disorder, post traumatic stress

disorder, and oppositional defiance. (Tr. 346). On initial consideration, the Social Security

Administration denied Claimant's claims for benefits. (Tr. 341-50, 335). Claimant requested a

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Linda McMahon, as the proper party defendant. See 20 C.F.R. § 422.210(d).
[2] "Tr." refers to the page of the administrative record filed by the defendant with its Answer (Docket No. 11/filed November 16, 2006).

hearing before an Administrative Law Judge ("ALJ").  (Tr. 340).  On October 13, 2005, a hearing was held before an ALJ.  (Tr. 355-74).  Claimant testified and was represented by counsel.  (Id.).  Claimant's mother and  also testified at the hearing.  (Tr.365-72).  Thereafter, on December 30, 2005, the ALJ issued a decision denying Claimant's claims for benefits.  (Tr. 8-20).  After considering the additional evidence submitted, a letter from Claimant's counsel, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on June 29, 2006.  (Tr. 3-6, 351-54).  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

II.     **Evidence Before the ALJ**

    **A.  Hearing on October 13, 2005**

        **1.  Claimant's Testimony**

At the hearing on October13, 2005, Claimant testified in response to questions posed by the ALJ and counsel.  (Tr. 358-65).  Claimant's date of birth is January 15, 1998, and at the time of the hearing, Claimant was seventeen years of age.  (Tr. 358).  Claimant lives with her mother, Joyce M. Calloway, two siblings, and niece and is an eleventh grade student at Normandy High School.  Claimant is right-handed and stands at five-feet three inches and weighs 158 pounds. (Tr. 358).  Claimant testified that she does not receive any special education classes or extra help at school.  (Tr. 358-59).  Claimant has had trouble with other students in school.  (Tr. 359).  A few months before the hearing, Claimant responded to another student's comment and started arguing with the girl, but Claimant was not punished by the school.  (Tr. 359).  Claimant returned home sometime in the last year and gets along okay with her family members.  (Tr. 359-60).

Claimant testified that she has problems understanding at school and asks a lot of questions

when she does not understand something at school.  (Tr. 360).  Claimant becomes distracted at school when other students are talking or when she sees something outside the window.  Claimant's mother helps her organize her school work and complete her homework, especially her world history work, her most difficult class.  (Tr. 360).  Claimant becomes distracted by the television at home and sometimes falls asleep.  (Tr. 361).

As to her daily activities, Claimant testified that she falls asleep for two hours every day after school and goes to bed around 10:00 p.m. although she does not fall asleep until 10:30 p.m.  (Tr. 361-62).  Claimant takes the medications prescribed to her by Dr. Jones with reminder assistance from her mother.  (Tr. 362).  Claimant takes medications to assist her sleeping and to improve her attitude.  Claimant receives treatment from the doctor every three months.  (Tr. 362).  Claimant has not recently thought about hurting or cutting herself.  (Tr. 363).  A year earlier, Claimant thought about hurting herself and Dr. Jones has been helping her.  Claimant experiences mood swings such that one minute she is happy but the next minute she starts crying.  (Tr. 363).  Claimant has one friend at school who she sees at school and sometimes eats lunch with her.  (Tr. 364).  Claimant's mother reminds Claimant to shower, wash the dishes, and to take her medicines.  (Tr. 364).

## 2.  Testimony of Claimant's Mother

Claimant's mother, Joyce Calloway, testified in response to counsel's question.  (Tr. 365-72).  Ms. Calloway recalled Claimant first having problems at the age of eight when Claimant tried to go up the second story window after she told Claimant she could not go outside and play.  (Tr. 365).  Ms. Calloway testified that Claimant became angry and spent ten days in the program at Lutheran Hospital and started medication.  (Tr. 365).  Ms. Calloway reminds Claimant to take her

medications for depression, anxiety, and hyperactivity. (Tr. 365-66). Claimant's medications have helped Claimant somewhat, but Claimant still experiences crying spells. (Tr. 366). Ms. Calloway explained that Claimant bit her nails to the point of infecting and causing her fingers to bleed within the last month. (Tr. 36).

Claimant returned to her mother's custody in February, 2004. (Tr. 367). Ms. Calloway testified that Claimant had been removed from her home in December after running away because she could not stay our late with one of her friends. (Tr. 367). Claimant and her mother argued about the incident, and Claimant hit her mother on the arm. Because Ms. Calloway found Claimant to be uncontrollable, she called the police for assistance. The police officer decided to take Claimant into custody at the juvenile detention center after Claimant cursed at the officer. (Tr. 367). Claimant also resided at Lakeside Residential Facility for almost two years. (Tr. 367-68). Since Claimant's return, Ms. Calloway has made sure Claimant attends school. Claimant is an eleventh grade student and doing well except in history. (Tr. 368). Ms. Calloway assists Claimant in understanding and completing her homework and preventing Claimant from becoming frustrated. (Tr. 369).

Claimant's chores at home include washing the dishes and cleaning her room. (Tr. 369). Ms. Calloway has to remind Claimant numerous times to complete the chores. Twice a day Ms. Calloway reminds Claimant to take her medications. (Tr. 369). Ms. Calloway has to coax Claimant into getting out of bed and taking a shower. (Tr. 370). Ms. Calloway testified that Claimant is doing better following the rules of the house, but she sometimes argues with her fifteen year-old brother. (Tr. 370). Claimant sometimes has one girlfriend to the house. (Tr. 371). Dr. Jones treats Claimant every two to three months. Sometimes Ms. Calloway takes Claimant, but

other times, Claimant goes by herself to the appointments with Dr. Jones. Claimant has not been hospitalized for any problems described by her mother in the last year. (Tr. 371).

In response to the ALJ's question regarding why Claimant was out of her medications, Ms. Calloway explained how the insurance would not cover a particular medication, Zoloft. (Tr. 371). Otherwise, Ms. Calloway testified that Claimant has been taking her medication. (Tr. 372). The school nurses administers Claimant's medication, because her mother has executed a permission slip allowing the nurse to administer the medication. In response to the ALJ's inquiry about a gap in treatment by Dr. Jones from April to September, Ms. Calloway testified that she might have rescheduled an appointment. (Tr. 372).

### 3. Open Record

During the hearing and at the request of counsel, the ALJ determined that the record would be held open for two weeks so that Claimant's counsel could submit updated records including progress notes from Claimant's counselor, Matt Jirauch of Depaul Health Center. (Tr. 372-74). At the conclusion of the hearing, the ALJ stated on the record that he would place the case in post-development status to allow counsel to submit the updated records from Matt Jirauch. (Tr. 374). A review of the record shows that counsel did not submit additional evidence from Mr. Jirauch to the ALJ before he issued a decision denying Claimant's claims for benefits as directed by the ALJ. (Tr. 372-74). The last record submitted from Mr. Jirauch is the letter dated June 22, 2005, to the disability determinations counselor, wherein Mr. Jirauch noted that Claimant achieved the therapeutic goals and her case was successfully closed in December, 2004. (Tr. 308).

### 4. Forms Completed by Claimant

In the Disability Report- Appeal dated September 8, 2004, Claimant's mother indicated that Claimant has experienced a change in her condition since last completing a disability report as follows: Claimant's medication was changed because of a loud outburst and a change in Claimant's behavior. (Tr. 341). In the Remarks section, Claimant's mother noted how Dr. Jones added Depakote to Claimant's medication regime to help calm down Claimant. (Tr. 344). Claimant's mother indicated that Claimant has been tested by the special school district for special services to assist Claimant. (Tr. 344).

In the Disability Report - Child, Claimant's date of disability is listed as April 1, 2004, and her disabling conditions are bipolar disorder, post traumatic stress disorder, and oppositional defiance. (Tr. 346).

## III.    Medical Records

At the outset, the undersigned notes that most of the medical evidence in the record relates to the period before Claimant's disability onset date of April 1, 2004. (See Tr. 21-239).

On September 22, 1999, Dr. Narsi Muddasani performed a psychiatric evaluation of Claimant because of her severe suicidal ideation. (Tr. 285). Claimant's mother reported that Claimant attempted to commit suicide by jumping out of the second story window. Dr. Muddasani noted that Claimant laughed inappropriately throughout the interview. (Tr. 285). Dr. Muddasani's admitting diagnosis included major depression, episode severe without psychotic features, conflicts at home, and a GAF of 10. (Tr. 286). Dr. Muddasani decided to admit Claimant to the adolescent psychiatric program and engage her in individual and group therapy. (Tr. 286). On September 26, 1999, Claimant was discharged to home and ordered to continue outpatient follow-up with Dr. Muddasani and Dr. Farzana. (Tr. 287). Dr. Muddasani opined that

Claimant has been stabilized on Celexa.  (Tr. 287).

From April 26, 2002, through February 4, 2003, Claimant resided at Lakeside Center.  (Tr. 258-87).  In the admission summary, Claimant was referred for emergency shelter care after having resided in St. Louis County Juvenile Detention Center after assaulting her mother.  (Tr. 270). s On October 21, 2002, Dr. LaRhonda Jones, a child and adolescent psychiatrist with St. Louis County Human Services, evaluated Claimant and prescribed Zoloft and Trazodone.  (Tr.265).   Dr. Jones noted that Claimant is residing at Lakeside after assaulting her mother and a police officer and has been in custody since the end of February.  (Tr. 266).  Claimant reported improved relationship with her mother.  Claimant reported difficulty in controlling her anger and attempting to harm herself by self mutilation.  On November 18, 2002, Dr. Jones increased Claimant's Zoloft dosage and prescribed Neurontin to help stabilize her mood.  (Tr. 263).  It was noted that Claimant continued to be impulsive, angry, and self mutilating.  (Tr. 264).  On May 9, 2002, Dr. Jones increased Claimant's Zoloft and Neurontin dosages to help address her mood and suicidal ideation. (Tr. 261).

On February 9, 2003, Claimant was admitted to DePaul Health Center after a suicide attempt and to treat suicidal ideation.  (Tr. 22, 40-42, 55-59, 67-70).  The admitting doctor found Claimant to be a danger to herself after being transferred from Mary Grove after cutting her forearm with a razor blade.  (Tr. 41).  Neurontin, Zoloft, and Trazodone are listed as Claimant's medications.  (Tr. 41).  In the diagnosis section, the doctor listed bipolar, depression, and physical and sexual abuse.  (Tr. 42).  In the initial discharge plan, the doctor opined that Claimant's placement upon discharge to be determined.  (Tr. 42).  In the intake assessment, the examining doctor noted that Claimant has superficial cuts on her left arm.  (Tr. 43, 56).  The doctor opined

that Claimant would be hospitalized to assist her with coping skills. (Tr. 44).

Claimant participated in group therapy for coping skills during her hospitalization. (Tr. 70-238). On February 11, 2003, Claimant reported improvement since changing her medications. (Tr. 77). On February 15, 2003, Claimant denied having any suicidal ideation. (Tr. 90). In the Discharge Note dated February 26, 2003, Claimant's discharge diagnosis included post-traumatic stress disorder, bipolar affective disorder depressed, and a GAF of 40. (Tr. 25). DePaul Health Center discharged Claimant to the Division of Youth Services. Claimant's discharge medications included Clonidine, Neurontin, Zoloft, and Desyrel. During her hospitalization, Claimant had been monitored for safety. (Tr. 25).

Claimant received treatment at Hawthorn Children's Psychiatric Hospital from May 1, 2003, through February 6, 2004. (Tr. 245). Claimant was admitted to the residential program from detention where she had been placed for four to five months after being on the run from a previous placement. (Tr. 247A). Claimant's history is notable for recurrent suicide attempts with self-injurious behavior including cutting of her wrists and a history of attempted molestation. (Tr. 247A). At the time of admission, Claimant was in the custody of St. Louis County Family Court. (Tr. 251). Claimant has a history of acting out and suicidal behaviors dating back to 1999. On April 26, 2002, Claimant was placed in the Residential Treatment Program at Lakeside, but she had great difficulty being compliant with the program rules and eventually became a danger to herself and others. After being admitted to Marygrove, Claimant exhibited self-injurious behavior and elopement, and thereafter, Claimant was returned to detention and subsequently referred to Hawthorn Residential Program. (Tr. 251). Claimant attended individual, group, and recreational therapy. (Tr. 252-53). It was noted that Claimant had no episodes of physical aggression and had

been compliant with her medication regimen.  (Tr. 252-53).  With respect to recreation therapy, it was noted that Claimant's attendance had been regular and her activities included leisure recreation, board games, choir, holiday trivia, walking, gym activities, social skills, karaoke, and arts and crafts.  (Tr. 253).  Claimant was discharged to her mother's home since her home passes had been successful.  (Tr. 254).

In the Initial Assessment from the BJC Behavioral Health dated January 22, 2004, Marla Placke, LPC, noted that since Claimant has achieved stabilization in residential treatment, she will be reunited with her family with aftercare services to ease the transition.  (Tr. 328-33).  Ms. Placke noted that after Claimant had been initially diagnosed with Major Depressive Disorder, her mother believed that Claimant did not need the medication prescribed, and so her mother did not administer Celexa as prescribed to Claimant.  (Tr. 329).  In May, 2003, Claimant was placed into residential treatment at Hawthorn Children's Psychiatric Hospital because of the extent of her psychiatric needs.  At Hawthorn, Claimant met all of her residential treatment goals including handling conflict without arguing, refraining from physical and verbal aggression, communicating with family, respecting personal space, displaying appropriate social skills, and processing past sexual abuse.  Dr. Surratt of Hawthorn diagnosed Claimant with post traumatic stress disorder, oppositional defiant disorder, mood disorder, and unspecified language disorder.  Ms. Placke noted that Claimant has made significant improvements in curtailing aggressive, self-destructive, and non-compliant behaviors during her residential placement for the last two years.  (Tr. 332).  In order to achieve a successful transition, Ms. Placke recommended continued medication services with a community psychiatrist and counseling to maintain Claimant's progress.  (Tr. 332).

In the Discharge Summary from Hawthorn Children's Psychiatric Hospital dated January

22, 2004, Claimant's discharge diagnosis included post traumatic stress disorder, oppositional

defiant disorder, mood disorder, educational problems, and severe legal problems. (Tr. 245). Dr.

Angela Khan noted that Claimant had been placed in a residential program through the Division of

Youth Services for psychiatric treatment. Claimant reported being admitted from detention where

she was place four to five months earlier after being on the run from her previous placement. Dr.

Khan noted that Claimant's history is notable for recurrent suicide attempts with self-injurious

behavior and a history of attempted molestation by a former neighbor. On admission, Claimant

denied any suicidal ideation. (Tr. 245). At discharge, Claimant's medication plan included

Clonidine, Neurontin, Zoloft, Ritalin, and Trazodone. (Tr. 246). In the RT Discharge Note, Dr.

Khan opined as follows:

> Pt's overall attendance to RT activities has been high and pt actively participated in
> RT activities the majority of time. RT activities attended included: leisure rec., free
> RT, golf, clay, darts/pool, Friday evening movies, ice cream social, bingo, karaoke,
> music appreciation, walking, softball, arts and crafts, ceramics, public speaking,
> holiday dances, holiday presentations and activities, and out trips to bowling alley,
> public library/parks, swimming pool, and Worlds of Fun.
>
> Effort and motivation levels were very high in RT classes during the last half of pt's
> admission. Pt displayed a positive attitude and demonstrated growth towards more
> positive and appropriate interactions with peers and staff. Pt displayed an increased level of
> appropriate expression and impulse control in dealing with conflict situations and/or emotional
> agitation. Pt met RT goals and objectives.

(Tr. 247). Dr. Eleatha Surratt determined to keep Claimant on her current medication regimen

including Zoloft, Trazodone, and Neurotnin. (Tr. 248). The Educational Discharge Summary

reflects that Claimant's classroom behavior and academic behavior to usually be appropriate and

her grades to be B or C in all subjects. (Tr. 255-56).

In the Addendum of Psychological/Clinical Assessment dated February 19, 2004, a doctor

at BJC Behavioral Health requested that Claimant be upgraded to another program after completion of a lengthy residential placement and placement returned to home. (Tr. 325). The doctor noted that Claimant has made significant improvements in curtailing aggressive, self-destructive, and non-compliant behaviors. Claimant had recently returned to her family home and the doctor wanted to put in place some supports so that Claimant would make a successful transition. The doctor recommended that Claimant continue seeking medication services and counseling to maintain her progress and be admitted into the CPR program so that she would benefit from more intensive face-to-face community support. (Tr. 325).

On referral from the BJC case manager to help Claimant adust to returning home from Hawthorne Psychiatric Hospital, Matthew Jirauch, LCSW evaluated Claimant on February 26, 2004. (Tr. 308-10). Mr. Jirauch noted that Claimant presents symptoms of depressive disorder and possibly bipolar disorder as well as ADHD, her medications are consistent with these diagnostic impressions, and Dr. Jones implements her medications management. (Tr. 309). Mr. Jirauch listed Claimant's therapeutic goals to include supporting Claimant in taking her psychotropic medications as prescribed, and assisting Claimant in expressing her feelings appropriately, in developing a more proactive social life, in learning to control her behavioral acting out, in maintaining her placement in her mother's home, and in being successful in school. (Tr. 309-10). The individual treatment and rehabilitation progress notes dated February 26, 2004, through  document Claimant's progress in achieving the therapeutic goals. (Tr. 319-24)

In an office visit on April 30, 2004, Claimant reported doing okay and not having problems at school but having some problems at home because of her failure to do chores. (Tr. 304). Claimant reported no side effects from her Zoloft and Neurontin prescriptions. Claimant's mother

reported that "pt is 100% better than prior to Lakeside." (Tr. 304). Dr. Jones refilled Claimant's Zoloft and Neurontin prescriptions. (Tr. 305).

On referral from the Missouri Department of Elementary and Secondary Education, Section of Disability Determinations, Dr. L. Lynn Mades, a Ph.D. and licensed psychologist, evaluated Claimant on July 15, 2004. (Tr. 311-16). Dr. Mades listed as Claimant's chief complaints bipolar disorder, post traumatic stress disorder, and defiant but noted that Claimant denied any current problems at the time of the evaluation. (Tr. 311). Claimant reported past juvenile placements with discharge in February, 2004, and problems with fighting and being an angry child. Claimant's placement at the juveniles facilities and her medication regime have helped her control her moods. (Tr. 311). Claimant indicated that her self-harming behaviors such as cutting herself were not suicide attempts but more so an effort to feel better. (Tr. 312). Claimant's mother reported a history of physical-acting out, including hitting and pushing, but indicated that Claimant is doing better. (Tr. 312). Dr. Mades noted that based on the records, Claimant's mother "has not always been good at following through with treatment recommendations." (Tr. 313). Claimant indicated that she would like to attend college and major in journalism. (Tr. 313). Examination revealed Claimant not to have any problems with thought process or content. (Tr. 314). Claimant's memory for recent and remote events appeared to be within normal limits. Claimant's intelligence appeared to be in the average range. With respect to social functioning, Claimant reported getting along adequately with peers and adults at that time but has a long history of difficulties in this area. (Tr. 314). Claimant performed simple calculations without difficulty and showed a good ability to assess similarities. Dr. Mades found Claimant's GAF to be 70 and noted conduct disorder, mood disorder, and psychological and

environmental problems as her diagnosis. (Tr. 315). Dr. Mades opined that Claimant has experienced considerable progress with behavioral management over the past two years. Dr. Mades noted that Claimant's school activity would appear to be significantly affected by her psychological impairment at that time. (Tr. 315). With respect to Claimant's ability to relate to others including fellow students and teachers, Dr. Mades found Claimant's ability to be intact. (Tr. 316).

In a progress note dated August 27, 2004, Claimant's mother reported that Claimant "has been a bit more agitated lately. Hasn't been taking medication as she should." (Tr. 302). Claimant's mother also reported that Claimant appears depressed and disappointed because she was not accepted to North County Tech. Claimant reported that she "forgets her meds." and when she becomes upset she "blows." (Tr. 302). Claimant denied any self mutilation. (Tr. 302). Dr. Jones discontinued Claimant's Neurotnin prescription and prescribed Depakote, Zoloft, Trazodone, Clonidine, and Ritalin. (Tr. 303).

On October 4, 2004, Dr. Jones completed a Mental Medical Source Statement at the request of counsel. (Tr. 295). Dr. Jones found Claimant's activities of daily living, social functioning, and concentration, persistence, or pace to be markedly limited. (Tr. 295-96). Dr. Jones noted that Claimant has had one or two episodes of decompensation and the duration of her disability to last twelve months. (Tr. 297). Dr. Jones listed as her diagnosis ADHD and bipolar and her GAF at 60. (Tr. 298).

In a progress note dated October 26, 2004, Claimant reported to Dr. Jones that her summer had been cool. (Tr. 300). Claimant attended camp near Tennessee and had a good time. Claimant reported having a stable mood and not getting into any trouble. Claimant reported

school being fair and struggling in geometry but receiving tutoring. Claimant reported the increase in Zoloft has been helpful, and the Ritalin helping her concentration and Depakote helping her anger. Claimant reported getting along well with her mother. (Tr. 300). The mental status examination revealed that Claimant had good directed flow/content of thought and fair memory and intellect. (Tr. 301). Dr. Jones continued Claimant's Depakote, Zoloft, Trazodone, and Ritalin prescriptions. (Tr. 301).

In the Discharge Summary from the BJC Behavioral Plus dated January 14, 2005, Jen Simmons noted how Claimant had been referred to BJC Behavioral Health upon leaving the residential treatment facility. (Tr. 326). Ms. Simmons noted that after Claimant had been initially diagnosed with Major Depressive Disorder, her mother believed that Claimant did not need the medication prescribed, and so her mother did not administer Celexa as prescribed to Claimant. In May, 2003, Claimant was placed into residential treatment at Hawthorn Children's Psychiatric Hospital because of the extent of her psychiatric needs. At Hawthorn, Claimant met all of her residential treatment goals including handling conflict without arguing, refraining from physical and verbal aggression, communicating with family, respecting personal space, displaying appropriate social skills, and processing past sexual abuse. Dr. Surratt of Hawthorn diagnosed Claimant with post traumatic stress disorder, oppositional defiant disorder, mood disorder, and unspecified language disorder. (Tr. 326). In the Clinical Course section, Ms. Simmons noted how Claimant started seeing Dr. Jones in March, 2004, for medication services, and was prescribed Ritalin, Zoloft, Neurontin, Trazodone, and Clonidine and Claimant will continue to be treated by Dr. Jones after discharge. (Tr. 327). Claimant has been successful in achieving the goal of controlling and managing her anger at home and at school in that she had no major outbursts during the course of

treatment and zero incidents of self-harm. To control her anger, Claimant successfully used coping skills, including Journaling and seeking alone time when necessary. Claimant took her medications regularly and compliantly and participated in individual and family therapy. Claimant has been discharged by the therapist and won an award from the court for her great progress. With respect to the goal of avoiding bad peer influences, Claimant joined the ROTC and became involved in the drama program at school and attended summer camp where she formed some good friendships. Ms. Simmons determined that Claimant would be discharged from Community Health Plus because she had met all of her goals. (Tr. 327).

In the Mental Status note dated April 5, 2005, Dr. Jones prescribed Zoloft, Trazodone, Ritalin, and Depakote and directed Claimant to return in three months. (Tr. 243). Dr. Jones noted that Claimant had not seen since October, 2004, almost six months earlier. Claimant reported her grades dropping over the last semester. Dr. Jones noted that Claimant is more interested in the social aspects than school work. (Tr. 243). In a follow-up visit on September 27, 2005, Dr. LaRhonda Jones ordered Claimant to restart her medications. (Tr. 241). Claimant reported attending summer school and improving her GPA to a 3.0. (Tr. 242). Claimant is involved in ROTC and is more serious about school. Claimant reported being out of medications and crying more. (Tr. 242).

In a letter dated May 3, 2005, Maureen Rauscher, the executive director of the Special Education & Student Services of the St. Louis Public Schools, responded to the request for information about Claimant by noting that they could not locate any information indicating that Claimant received special education services. (Tr. 334).

In a letter dated June 22, 2005, to the disability determinations counselor, Mr. Jirauch

noted that Claimant achieved the therapeutic goals and her case was successfully closed in December, 2004.  (Tr. 308).

## IV.  The ALJ's Decision

The ALJ found that Claimant was seventeen years old and had never performed substantial gainful activity.  (Tr. 19).  The ALJ further found that the allegations of disability were not credible.  Claimant has the medically determinable impairment of a bipolar disorder.  However, her severe impairment was not of the severity that medically met or equaled any impairment listed in Part B of Appendix 1 to Subpart P, Listing of Impairments, 20 C.F.R. Part 404.  (Tr. 19).  Further, the ALJ found that Claimant did not have an impairment or combination of impairments that functionally equaled the listings or resulted in marked and severe functional limitations.  (Tr. 19-20).  Therefore, the ALJ concluded that Claimant had not been disabled at any time since protectively filing for Supplemental Security Income Benefits on April 8, 2004.  (Tr. 20).

## V.  Discussion

In a child disability insurance benefits case, the definition for disability for children is set forth in 20 C.F.R. § 416.906.  That provision states:

> If you are under age 18, we will consider you disabled if you have a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 416.906.

In determining disability, the ALJ must utilize a sequential evaluation process set forth in 20 C.F.R. § 416.924.  The ALJ first determines whether claimant is doing substantial gainful activity.  If so, the claimant is not disabled.  20 C.F.R. § 416.924(b).  If the claimant is not

- 16 -

working, the ALJ considers claimant's physical or mental impairment(s) to determine whether claimant has a medically determinable impairment(s) that is severe. If the impairment(s) is not medically determinable or is a slight abnormality that causes minimal limitations, the ALJ will find that claimant does not have a severe impairment and is not disabled. 20 C.F.R. § 416. 924(c). If the impairment(s) is severe, it must meet or medically or functionally equal the listings. 20 C.F.R. § 416.924(d); see also Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853 (8th Cir. 2003) (setting forth the three-step sequential steps to determine disability in children). The listings for mental disorders in children are contained in 20 C.F.R. Part 404, Subpart P, §§ 112.00-112.12.

Further, when determining functional limitations, 20 C.F.R. § 416.926a(a) provides that where a severe impairment or combination of impairments does not meet or medically equal any listing, the limitations will "functionally equal the listings" when the impairment(s) "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." The ALJ considers how a claimant functions in activities in the following six domains: "(I) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating to others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1). An impairment(s) is of listing-level severity if a claimant has "marked" limitations in two of the domains in paragraph (b)(1) or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). A child has a marked limitation in a domain if the impairment "interferes seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2).

When evaluating a claimant's ability to function in each domain, the Commissioner asks for and considers information that will help to answer the following questions: What activities is the

child able to perform?  What activities is the child unable to perform?  Which of the child's

activities are limited or restricted compared to other age-equivalent children who do not have

impairments?  Where does the child have difficulty with activities - at home, in childcare, at school,

or in the community?  Does the child have difficulty independently initiating, sustaining, or

completing activities?  What kind of help does the child need to do activities, how much help is

needed, or how often is it needed?  20 C.F.R. § 416.926a(b)(2)(I)-(v).

These questions are not, singularly or as a whole, the only factors useful to determining

whether or not a child has a "marked" or "extreme" limitation.  20 C.F.R. § 416.926a(e)(2)(4)(I).

If applicable, test scores can be used in combination with other factors, observations and evidence

to determine the level of impairment.  Id.  "Marked" or "extreme" limitations as defined by test

scores are not automatically conclusive if additional evidence in the record shows a pattern of

behavior inconsistent with test scores.  See 20 C.F.R. § 416.926a(e)(4).

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42

U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a

reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d

1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The

Court does not reweigh the evidence or review the record de novo.  Id. (internal citation omitted).

Instead, even if it is possible to draw two different conclusions from the evidence, the Court must

affirm the Commissioner's decision if it is supported by substantial evidence.  Id.; Clarke v. Chater,

75 F.3d 414, 416-17 (8th Cir. 1996).

The ALJ may discount claimant's subjective complaints if they are inconsistent with the

evidence as a whole, but the law requires the ALJ to make express credibility determinations and

set forth the inconsistencies in the record.  Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence.  Id.; Ricketts v. Secretary of Health and Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a claimant claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to claimant's complaints under the Polaski[3] standards and whether the evidence so contradicts claimant's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion.  Marciniak, 49 F.3d at 1354.

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account

---

[3]The Polaski factors include::
1.     the objective medical evidence;
2.     duration, frequency and intensity of the pain;
3.     precipitating and aggravating factors;
4.     claimant's daily activities;
5.     dosage, effectiveness and side effects of medication;
6.     functional restrictions.
Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

Claimant argues that the ALJ's determinations that she has a less then marked limitation in attending and completing tasks and in interacting and relating with others are not based upon substantial evidence. Claimant also contends that the ALJ's determination that she does not have impairments that functionally equal the listings is not supported by substantial evidence on the record as a whole.

### A.        Concentration, Persistence, and Pace/Attending and Completing Tasks

When analyzing the domain of attending and completing tasks, the Commissioner must consider how well the child is able to focus, maintain attention, and begin, carry out and finish activities. 20 C.F.R. § 416.926a(h). A child between 12 and 18 years old should be able to pay attention to long discussions, organize his materials, plan time effectively, and not be distracted by, or be a distraction to, peers. 20 C.F.R. § 416.926a(h)(3). Examples of limited functioning in this domain includes being easily distracted or overactive to sounds, movement or touch; being slow to focus or to complete activities of interest to you; being frequently sidetracked from activities or frequently interrupting others; and requiring extra supervision to keep on task or activity. 20 C.F.R. § 416.926a(h)(3)(I)-(v).

The ALJ cited relevant support for his conclusions and reconciled his opinion with substantial evidence in support. The record indicates that Claimant's overall attendance to residential treatment activities had been high and Claimant actively participated in the activities

such as leisure recreation, golf, clay, darts/pool, Friday evening movies, ice cream social, bingo, karaoke, music appreciation, walking, softball, arts and crafts, ceramics, public speaking, holiday dances, holiday presentations and activities, and out trips to bowling alley, public library/parks, swimming pool, and Worlds of Fun. The Educational Discharge Summary reflects that Claimant's classroom behavior and academic behavior to usually be appropriate and her grades to be B or C in all subjects. Likewise, Claimant reported to Dr. Jones how the prescribed medication regime helped her concentration. In a progress note dated September 27, 2005, Claimant reported to Dr. Jones how she has been involved with ROTC. After attending summer school in 2005, Claimant improved her GPA to a 3.0. The ALJ determined that the record is devoid of any medically documented findings of marked inattention or a doctor's diagnosis of an attention deficit disorder.[4] In his evaluation, Dr. Mades noted that Claimant performed simple calculations without difficulty. His examination revealed Claimant not to have any problems with thought process or content. Accordingly, substantial evidence supports the ALJ's determination that Claimant's limitation in attending and completing tasks was less than marked and no more than a mild impairment.

### B.    Social Functioning/Interacting and Relating with Others

When analyzing the domain of interacting and relating with others, the Commissioner

---

[4]The ALJ discredited Dr. Jones summary diagnosis of ADHD set forth in the Mental Medical Source Statement by noting the inconsistencies in the record as a whole including Dr. Jones own treatment notes. Likewise, the diagnosis of ADHD requires an assessment of the child's level of inattention, hyperactivity, and impulsivity. See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 92-93 (4th ed.2000). DSM-IV-TR criteria for diagnosing ADHD are (1) six or more of a list of symptoms for inattention or six or more symptoms of a list of symptoms for hyperactivity-impulsivity; (2) some hyperactive-impulsive or inattentive symptoms that caused impairment and were present before age 7; (3) some impairment from the symptoms present in two or more settings; (4) clear evidence of clinically significant in social, academic, or occupational functioning; and (5) symptoms do not occur exclusively during the course of another mental or developmental disorder. DSM-IV-Tr at 92-93.

considers how well the child initiates and sustains emotional connections with others, develops and uses the language of the child's community, cooperates with others, complies with the rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. ¶ 416.926a(I). Examples of limited functioning in this domain are that the child has no close friends or has friends that are all older or younger than the child; avoids or withdraws from people the child knows, or is overly anxious or fearful of meeting new people or tying new experiences; has difficulty playing games or sports with rules; has difficulty communicating with others, e.g., in using verbal and nonverbal skills for self-expression, carrying on a conversation, or in asking for assistance; and has difficulty speaking intelligibly. 20 C.F.R. § 416.926a(i)(3)(ii)-(vi).

The ALJ articulated a clear basis for not finding a marked limitation in this domain, and substantial evidence supports the determination that Claimant had no more than a mild impairment. The record and the ALJ indicated that Claimant has a history of depression and oppositional defiant disorder. However, the record further indicates that Claimant participated in the residential treatment activities. At Hawthorn, Claimant met all of her residential treatment goals including handling conflict without arguing, refraining from physical and verbal aggression, communicating with family, respecting personal space, and displaying appropriate social skills. Further, Claimant has not been in trouble at school since her freshman year. Claimant testified that she gets along all right with family members and has a friend at school. Claimant's mother reported to Dr. Jones that "pt is 100% better than prior to Lakeside." (Tr. 304). During the office visit, Claimant reported not having problems at school. Claimant's mother testified that Claimant does not stay out late, has friends, and gets along with her family members. Her mother also testified that Claimant is doing better following the rules of the house, but she sometimes argues

with her fifteen year-old brother.  Further, Ms. Simmons found that Claimant had achieved her therapy goals and noted that Claimant became involved in ROTC and the drama program at school and attended summer camp where she formed some good friendships.  Likewise, Claimant reported to Dr. Jones in October, 2004, that she is getting along well with her mother.  The mental status examination revealed that Claimant had good directed flow/content of thought and fair memory and intellect. With respect to Claimant's ability to relate to others including fellow students and teachers, Dr. Mades found Claimant's ability to be intact. With respect to social functioning, Claimant reported getting along adequately with peers and adults at that time.  Based on the record, the ALJ opined that "the evidence shows that the claimant relates appropriately to other children and to adults, solves conflicts between self and others, asks for help appropriately when needed, and communicates in all kinds of environments and with all types of people."  (Tr. 18).  The substantial evidence supports the ALJ's finding that Claimant's impairments in this domain are less than marked.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).   Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed and that

Claimant's complaint be dismissed with prejudice.

Dated this  30th  day of September, 2007.

                                             /s/ Terry L 4Adelman
                                             UNITED STATES MAGISTRATE JUDGE